**STATEMENT OF FACTS**

1.      This affidavit is submitted in support of a criminal complaint and arrest warrant charging Irving Froilan LEON ALVARADO also known as 'El 18' ("LEON ALVARADO"), with having violated 21 U.S.C. §§ 959(a), 960(b)(1)(H), and 963 (conspiracy to manufacture and distribute 500 grams or more of a substance containing a detectable amount of methamphetamine for importation into the United States) and 18 U.S.C. § 924(c) (use, carry, and possession of a firearm in furtherance of a drug trafficking offense), in an offense that was begun and committed in Mexico and elsewhere outside the jurisdiction of any particular state or district, but within the extraterritorial jurisdiction of the United States and within the venue of the United States District Court for the District of Columbia, pursuant to Title 18, United States Code, Section 3238..

2.      I, Joseluis Felipe Ayala, am an investigative and law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and I am authorized to conduct investigations of, and make arrests for, drug trafficking offenses enumerated in 18 U.S.C. § 2516.

3.      I have been employed as a Special Agent with the FBI since XXXXX XXXX, where I am assigned to squad CR-3 at the Washington Field Office (WFO). Squad CR-3 is responsible for conducting investigations that target international drug trafficking organizations. Since April 2023, I have been working on federal narcotics investigations and have participated in several investigations which have led to the arrest and conviction of narcotics distributors. Since 2022, I have received training and experience in interviewing and interrogation techniques, arrest procedures, search and seizure, narcotics, search applications, and various other criminal investigative techniques. During the course of my training and experience, I have become

familiar with the methods and techniques associated with the importation and distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. In the course of conducting these investigations, I have been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; supporting undercover operations; consensual monitoring and recordings of both telephonic and non-telephonic communications; analyzing telephone pen registers and caller identification system data; conducting court-authorized electronic surveillance; and preparing and executing search and arrest warrants that have led to seizures of narcotics, firearms, and other contraband.

4. This affidavit is submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging LEON ALVARADO, with violations of 21 U.S.C. §§ 959(a), 960(b)(1)(H), and 963 (conspiracy to manufacture and distribute 500 grams or more of a substance containing a detectable amount of methamphetamine for importation into the United States) and 18 U.S.C. § 924(c) (use, carry, and possession of a firearm in furtherance of a drug trafficking offense). The information contained within this affidavit is based upon my own knowledge of the investigation and upon information provided to me by other law enforcement officers. Where conversations or statements of others are related herein, they are related in substance and in part. Moreover, because this affidavit is submitted for a limited purpose, I have not set forth every fact that I have learned in the course of the investigation.

## PROBABLE CAUSE

### Background

5. The Sinaloa Cartel (hereinafter "the Cartel") is a significant drug trafficking organization ("DTO") and foreign terrorist organization ("FTO"), based in the Mexican state of Sinaloa, responsible for shipping multi-ton quantities of narcotics, including fentanyl, heroin, methamphetamine, and cocaine, from Mexico to the United States, and elsewhere. The Cartel has dominated the drug trade through its use of superior smuggling routes; corruption of local, state, and federal government officials within Mexico; and violent acts of retribution including murder, kidnappings, tortures, and forceful collection of drug debts. The Cartel employs a decentralized organizational structure, leaving trusted individuals to run municipalities and rural areas under their command. These individuals are referred to as "plaza bosses."

6. The two main factions of the Cartel from approximately 2015 to the present time are Los Chapitos faction, led by Ivan Archivaldo GUZMAN SALAZAR and Jesus Alfredo GUZMAN SALAZAR, who are the two eldest sons of Joaquin Archivaldo GUZMAN LOERA aka El Chapo;[1] and La Mayiza faction, currently led by Ismael ZAMBADA SICAIROS aka El Mayito Flaco, who is the son of Ismael ZAMBADA GARCIA aka El Mayo.[2]

7. Both factions engage in trafficking multi-ton quantities of narcotics from Mexico to the United States; maintain various armed wings in charge of extortion and targeted assassinations; and coordinate sophisticated corruption networks. Shortly after the arrest of

---

[1] On November 5, 2018, and February 12, 2019, Joaquin Archivaldo Guzman Loera was found guilty in the Eastern District of New York of numerous criminal charges stemming from his role in the Cartel.

[2] On August 25, 2025, Ismael Zambada Garcia pled guilty in the Eastern District of New York to criminal charges stemming from his role in the Cartel.

ZAMBADA GARCIA in the United States in July 2024, a war began between La Mayiza and Los Chapitos in or about September 2024, primarily focused in Sinaloa, Mexico. La Mayiza and Los Chapitos mobilized their respective security and paramilitary infrastructures and led a campaign of targeted and indiscriminate violence in an effort to eradicate one another and establish control of the Cartel.

## LEON ALVARADO

8. Confidential Human Source ("CHS-1") came to the attention of the FBI in September 2025 and began to cooperate with and at the direction of the FBI.[3] CHS-1 explained that they were born and raised in Sinaloa, Mexico. CHS-1 stated that they had met LEON ALVARADO in approximately June 2024. CHS-1 further stated that they had been involved in the social circles with LEON ALVARADO, that they interacted almost daily with LEON ALVARADO, and that they were in a romantic relationship. LEON ALVARADO had told CHS-1 that he was a member of the Los Chapitos branch of the Sinaloa Cartel, and that within the Cartel hierarchy, LEON ALVARADO was positioned as a personal bodyguard for Ovidio GUZMAN LOPEZ aka El Raton prior to GUZMAN LOPEZ's arrest.[4] LEON ALVARADO

---

[3] The FBI is providing immigration benefits in exchange for CHS-1's cooperation. CHS-1 does not have any criminal history. During the time CHS-1 has served as a confidential source, CHS-1 has provided information that has proven to be truthful and, to the extent possible, has been corroborated through various investigative techniques and independent investigation. However, when CHS-1 was questioned about an altercation with their significant other that resulted in the significant other being arrested, CHS-1 characterized the altercation as an argument and did not mention that their significant other had hit CHS-1. FBI later obtained a police report, detailing a review of CCTV footage of the altercation, which showed CHS-1 had been hit by the significant other.

[4] GUZMAN LOPEZ was arrested in Mexico in January 2023 by Government of Mexico Security Forces. On July 11, 2025, GUZMAN LOPEZ pled guilty in the Northern District of Illinois to four counts; including violations of 21 U.S.C. §§ 848(a), (b), and (c) (engaging in a continuing criminal enterprise) and 21 U.S.C. § 963 (conspiracy to import a controlled substance into the United States and to manufacture and distribute a controlled substance

further stated that after GUZMAN LOPEZ's arrest, LEON ALVARADO was assigned as a personal security element for GUZMAN LOPEZ's immediate family based in Sinaloa, Mexico.

9. LEON ALVARADO stated to CHS-1 that after being released from prison in the United States and being deported back to Mexico, LEON ALVARADO started working for the Cartel as a lookout. According to law enforcement records, LEON ALVARADO was released from custody in the United States in approximately 2018. He was arrested in January 2017 and convicted for distributing marijuana. LEON ALVARADO stated that he started to work his way up from being a lookout to a bodyguard in the Cartel.

10. On or about August 30, 2025, FBI obtained a cellular device that was utilized by CHS-1 during their time in Mexico. CHS-1 provided verbal consent to allow investigators to search the device, and stated the device was used to communicate with various individuals, including LEON ALVARADO.

11. Upon a review of the device, investigators found a photograph of LEON ALVARADO, dressed in tactical gear, and holding a large firearm. The photograph was dated July 19, 2024. *See* Figure 1. Based on my training, experience, and knowledge of the investigation, the photograph is consistent with LEON ALVARADO acting in the capacity of a personal bodyguard in the Sinaloa Cartel, as previously stated to CHS-1. Bodyguards are responsible for protecting leaders of the Sinaloa Cartel from rival cartels and government forces, so that they can continue to traffic drugs. Additionally, I know that bodyguards in the Cartel are sometimes paid in drugs instead of in money. The bodyguards are expected to sell the

---

intending, knowing, and having reasonable cause to believe it would be unlawfully imported in the United States) for his role in the Cartel.

merchandise locally within Mexico, or seek to traffic drugs to the United States, earning a commission from the sale of the drugs in the United States. It is known that bodyguards will establish trafficking operations, under the auspices of the Cartel's bosses, as a way to earn additional income independent from their payroll.



FIGURE 1: Photograph of LEON ALVARADO holding a firearm

**March 2015 Methamphetamine Seizure**

12. On March 10, 2015, Customs and Border Protection Officers ("CBP"), at the Calexico, California, West Port of Entry ("POE"), conducted a secondary inspection of a Burgundy Chevrolet Impala. The driver of the vehicle, later identified by CBP as Confidential Witness-1 ("CW-1"), was the sole occupant of the vehicle. CBP officers inspected the rocker panels of the Impala and observed lead lined compartments in the panels. The panels were opened, and packages were observed in both panels. One package was probed which produced a clear crystal-like substance that field-tested positive for the presence of methamphetamines. A

complete inspection of the Impala yielded eight packages on the driver's side, and seven packages on the passenger's side. In total, 15 packages were seized, and were weighed totaling 7.74 kilograms;14 packages were labeled with the letter 'R', and one package was labeled with the letters 'AB.' S*ee* Figures 2 and 3. CW-1 was placed under arrest by CBP for violation of 21 U.S.C. §§ 952 and 960 (importation of a controlled substance) and was remanded to the custody of Homeland Security Investigations ("HSI") for subsequent investigation.



(FIGURES 2&3: Photos of the Seized Methamphetamine and Impala Vehicle)

13. During a post arrest interview, after waiving their *Miranda* rights, CW-1 stated they were recruited by Confidential Witness-2 ("CW-2"), via a Facebook account, to courier the methamphetamine from Mexico into the United States. Later in the day, and based on information provided byCW-1, HSI agents located and arrested CW-2 in Calexico, California for violation of 21 U.S.C. §§ 952, 960, and 963 (conspiracy to import a controlled substance).

14. During a post arrest interview, after waiving their *Miranda* rights, CW-2 stated that they were supposed to meet with CW-1 in Calexico, and the tandem would transport the narcotics to Phoenix, Arizona. CW-2 further stated that they were to call a contact saved in CW-

2's cellular phone as 'ALKAEDA' in Culiacan, Sinaloa, Mexico, to tell ALKAEDA that CW-1 had successfully smuggled the methamphetamine and had arrived in the Phoenix area. CW-2 stated to investigators that ALKAEDA was the person CW-2 communicated with via Facebook to coordinate the smuggling of narcotics and told investigators that CW-2's Facebook account contained messages between CW-2 and ALKAEDA. CW-2 stated ALKAEDA's Facebook account screen name was "Jose Angel Lopez."

15. On April 17, 2015, HSI obtained a search Warrant for ALKAEDA's Facebook account. Upon a review of the information, investigators found the messages that were sent between CW-2 and ALKAEDA on March 10, 2015, that led to the smuggling of the methamphetamine by CW-1. Further review of ALKAEDA's Facebook Account revealed the following:[5]

    a. a December 30, 2014, message exchange between ALKAEDA and a Facebook account associated with David Iturrios OSUNA ("OSUNA"), that stated:

        **ALKAEDA: I uploaded a picture, just don't put any names.**
        **OSUNA: Who are you?**
        **ALKAEDA: Your friend, Irving Alvarado.**

    b. a April 2, 2015, incoming message from a Facebook account associated with Karla HURTADO ("HURTADO") that stated **"Happy Birthday, I hope you enjoy it, I'm sending you a big hug, best wishes now and ever."** Based on my training, experience, and knowledge of the investigation, this is consistent with HURTADO identifying ALKAEDA's date of birth as April 2, year unknown.

---

[5] Each of these chats were translated from Spanish to English and are summarized in pertinent part.

  c. a February 27, 2014, outgoing message to a Facebook account associated with Michoacana Villa Sanchez ("SANCHEZ") that reads **"I am going to send you a picture of me,"** followed by a photo of a male that is consistent LEON ALVARADO.

16. A query of law enforcement databases for Irving Froilan LEON ALVARADO, yielded a full-name identifiable hit, corresponding to a date of birth of April 2, 1992.

## **CONCLUSION**

17. Based on the foregoing facts, I respectfully submit that there is probable cause to believe that, from at least in or about 2015 until the present, Irving Froilan LEON ALVARADO did knowingly, intentionally, and willfully conspire with others to manufacture and distribute a controlled substance for importation into the United States, in violation of 21 U.S.C. §§ 959(a), 960(b)(1)(B)(ii), 960(b)(1)(F), 960(b)(1)(H), and 963; and did use, carry, and possess a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c).

            Respectfully submitted,

            _____
            Joseluis Felipe Ayala
            Special Agent
            Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this 16th day of January 2026.

_____
HON. ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE
FOR THE DISTRICT OF COLUMBIA